May it please the Court, I'm Joe Watley, on behalf of the appellants with me at the Council table is my partner, Edith Callas. I would like to spend, unless the Court has other questions... Well, you were shaking your head there. I thought maybe you were worried about whether you were going to be deported or not. After those arguments, I am, Your Honor, and I'd also like to reserve three minutes for rebuttal, but I hope I don't have to deal with those border people to accomplish it. Could I ask you, as you make your argument, in going through the complaint in your briefs, I found that it was difficult to distinguish between what arguments, claims, events involved ARINESP and which ones involved EPIGEN, which seemed to be different. You referred to them collectively as EPO. So I'd appreciate it, now that I've gone through and separated out these issues, if you could refer to them separately as the individual drugs rather than as EPO in your discussion with us. I will try my best to do that. I think, Your Honor, the fact that ARINESP is the drug that AMGEN took to the USPDI and got certified there for the anemia of cancer treatment, one of their off-label purposes makes that an important part. But actually, there were efforts on the part of both drugs because they're similar anemia-treating drugs, and the off-label uses of treatment of anemia of cancer and cancer itself, especially, are the key off-label marketing efforts that we think the fraudulent scheme focused on. When I looked at ARINESP, there was a number of press releases and activities relating to its use for anemia of cancer, I believe. But then, as I was working through it, I didn't see that you were alleging any tests or concealed results relating to ARINESP's use for anemia of cancer. Is that correct? No, Your Honor, it's not correct. What was the tests or uses that were concealed of ARINESP's use for anemia of cancer? Well, Your Honor, first of all, when you use something for anemia of cancer, it means that you are using the drug on a person who has cancer. And in 2003, there were two studies that Amgen became aware of that it did not disclose. The first was the study done by Johnson & Johnson where the study was closed because 70 cancer patients taking epigen or... And that was epigen, not ARINESP. They were taking EPO, but... They were taking epigen, not ARINESP, at least according to what I saw in the record. And that was for anemia of cancer for non-small cell lung cancer. And that test was terminated. So was there another test that was using ARINESP? There was a second study, Your Honor, although with all due respect, I think there's an obligation to disclose the fact that here these people are dying much earlier. Before we get to the duty to disclose and what the source of that is, can you just tell me whether there was a test relating to ARINESP for anemia of cancer? There was the test that we allege in paragraph 72 that did deal with epigen, not ARINESP. Okay, so there's epigen. Was there one for ARINESP? There was the test we allege in paragraph 73, the best test that dealt with breast cancer that was also terminated and never disclosed in a test in 2003. That was also epigen, according to you? It was also epigen, Your Honor. You're correct. Okay, so was there an ARINESP for anemia of cancer? Your Honor, there was not an ARINESP until there was also the December 2006 study that was alleged in paragraph 75. That is, they were making contrary statements around the same time. But that was treatment of cancer directly, not anemia of cancer, correct? Your Honor, it is treatment of cancer, but with all due respect, that is a distinction without a difference, and here's why. When you are giving the drugs to a person who has cancer, what these studies show is those people die earlier. Those cancer cells grow faster. They're not in the situation where they're having chemotherapy, and the anemia is caused by chemotherapy, and they're getting treatment to address the anemia of chemotherapy and having the benefits of chemotherapy. I just want to confirm just for my own understanding, because I did try to trace out your arguments as carefully as I could, that there was no ARINESP, the allegation in your complaint that ARINESP was used in a test for anemia of cancer that was then not disclosed. Is that correct? So you have the treatment of cancer directly, but not anemia of cancer. You're saying there's not much of a difference, but I just want to confirm that that's the case. I believe you can take that as correct, although that is not where the district court went. The district court didn't allege it that specifically. If they had, presumably we would have had an opportunity to re-plead in the court below, but the problem is when you have cancer and you get these drugs, what these tests were showing is you die earlier, and since you die earlier, we submit that there was a duty to disclose that to people while they were out there touting these drugs as being great treatments for people who have cancer but who are not getting chemotherapy. Did you allege in the complaint a duty to disclose? We alleged, we believe, Your Honor, facts that demonstrate a duty to disclose. So you didn't specifically allege a duty to disclose in the complaint. Is that right? We allege that they fraudulently concealed the information, including these information from the three tests and the information that they got in 2004 about the family of drugs from the FDA. Did we say specifically in the complaint they have a duty to disclose? I think it's certainly implicit from everything we said that they had a duty to disclose. Otherwise, the allegations would make no sense in terms of the fraudulent concealment we allege over and over again in the complaint. If you were going to, if the court had allowed you to amend the complaint, what would be the source of the duty to disclose? What is the legal source of that duty? The source of the duty to disclose, Your Honor, when a party makes a partial disclosure, as Amgen did in its press releases over and over again throughout this period of time, then a party has an obligation to make a full and complete and accurate disclosure. And what's the legal source of that duty? The legal source of that duty is, among other places, in the restatement. It is recognized generally in the California cases we cite. So you're saying there's a tort duty? I'm not understanding exactly what the source is. The source is a generally recognized duty when a person makes a disclosure that they know people are likely to rely upon, they've got an obligation to make a full and complete disclosure. The second source is, and we allege this over and over in the complaint, when there is a disparity of information. When one party has information that it knows other parties do not have, then it has an obligation to make disclosures. And here again, and I think a third duty, and this is where I think the district court really got it wrong in its last order. Remember in its first order it found that our allegations were sufficient under RICO. But the last issue, in the last order, it said even though Amgen had undisclosed evidence that people were dying earlier and their cancer cells were growing faster because of these drugs, and it did not disclose it, it was no duty to do so. When a company is out selling a drug that's supposed to make people better, when it's publicizing its drug and telling them if you take this drug your condition is going to get better, it has an obligation, we submit, to tell the truth. So you're saying that any, but your theory, because we already confirmed that there was no study relating to the use of Aranesp for anemia of cancer. So your theory is that any test of either Aranesp or Epigen for any off-label use, that there was some duty to disclose that in connection with a press release for a different use. Is that the theory? Well, the theory is that if that different use also involved cancer, and they've got research that shows that their product causes problems for people with cancer, yes, Your Honor, there is a duty to disclose. And I would also point out that in February of 2007, the CEO of Amgen said that we should have disclosed more of the information about Aranesp, speaking specifically about Aranesp. They said they should have done it. They didn't do it. Is it true? I'm sorry, go ahead. I just want to ask you this. Now, the district judge, in his order, told the plaintiffs how to fix their complaint. And here it is. He says, this is in the minute order, December 17, 2008, and page 11 of 12. He says at the bottom, So far as plaintiffs' claims are based solely on allegations that defendants promote EPO, that's epigen and Aranesp, for off-label purposes, they constitute an impermissible attempt to bring a private suit for violations of the FDCA. However, insofar as plaintiffs can identify specific representations by defendants that are literally false, misleading, or contain material omissions, the claims are actionable under RICO and California consumer fraud laws. As currently pled, however, plaintiffs' declarations of fraud, i.e. deceptive advertising, are so intertwined with allegations that defendants engaged in illegal off-label promotion that the court must dismiss the complaint in its entirety because, presumably, because they fall under the FDCA, which cannot be enforced by private actors. I added that. The court grants plaintiffs leave to amend their complaint to allege, with specificity required by Rule 9b of the Federal Rules of Civil Procedure, that defendants violated RICO and state consumer fraud laws by engaging in deceptive advertising that fraudulently misrepresented the safety of off-label uses of EPO. To be clear, the court emphasizes that plaintiffs may not rely on allegations that defendants engaged in off-label promotion of EPO. Instead, plaintiffs must point to specific misrepresentation made by defendants. Now, then you come to the next order of the judge. That's the minute order of June 17, 2009. And he says, for the foregoing reason the court grants Amgen's motion to dismiss, although Federal Rule of Civil Procedure 15a requires that leave to amend be freely given when justice so requires, a court has broad discretion to deny leave to amend when a plaintiff has previously amended the complaint. So he cites Allen v. City of Beverly Hills. In the instant case, the court previously identified in detail the deficiencies in the complaint and granted leave to amend. However, plaintiffs have made few substantive changes and added no new facts in support of their allegations of fraud. Instead, they filed an amended complaint with semantic changes that did nothing to cure the previous fatal defects. Dismissal is with prejudice. So he told you what you needed to do, and he says you didn't do it. And I think you didn't do it. You know, you didn't break these two up between the food and drug statute and the RICO and the other statutes. You didn't do it. And you just added a few words here and there. And so he dismissed the complaint. Why didn't you do what he asked you to do? No, I don't care about all due respect. Just tell me why you didn't do it. Your Honor, we thought we had done what he asked us to do, and let me tell you why. He told you you had to plead fraud with specificity. You had to separate the two. You didn't do that. Well, Your Honor, we alleged that. What you have to understand is that these are huge lawsuits. You know, when the judge tells you to do something, you need to do it. These are hard cases to manage. You understand that? Absolutely. There's tremendous work for the judge. And in many of these cases, the judge and his law clerk ends up doing the bulk of the work because the lawyers don't do it. They file a case, and they hope something's going to happen after that. So when the judge tells you to do something, you ought to do it. But you didn't. And that's why he dismissed the case. And I don't blame him for doing that, having been a district judge myself and have handled cases like this. It's a burden. It's a burden. I think it's, you know, I have no problem with class actions. But, you know, the lawyer's got to think of how these cases are administered, the time it takes, and get them organized and make them clear. That's what you've got to do. And he told you to do it, but you didn't do it. Well, Your Honor. And he went through a lot of trouble with all these. Your Honor, we allege studies that they had that they concealed for years and didn't disclose. We allege disclosures that they made, press releases that they made about the same issues, about treating patients with cancer without disclosing these facts. Did you break those claims down the way he asked you to? Yes, Your Honor. If you look, if you go through our complaint, Your Honor, if you go through, for example, starting in paragraph 71, we allege with specificity the studies they had, the information that they had that they didn't disclose. No, we don't allege any actual misrepresentations. I didn't see any allegations of specific misrepresentations. They represented this, you know, boom, boom, boom. Yeah, I didn't see that. All you've got in there is a long dissertation that's educational. You go through a lot of stuff in there. You know, everything is in there, but it's got to be tight. It's got to be organized. Well, Your Honor, we will, if given the opportunity, we will certainly take heed of this and do it. Well, you should know about this. I mean, you're a big-time class-action lawyer, aren't you? No, Your Honor, I'm just a country lawyer. I know, we're all country. I'm a country lawyer from Van Nuys, storefront office, and it didn't take me long to figure this out, which you have to do. You know, we're all country lawyers. Your Honor, if you look at his December order, remember in his earlier order in February of 2008, he had found that our allegations were sufficient, the same ones we have here. He told you what to do. But if you look just above, on page 11, just above the part where you quote, he says you don't have to just rely on misrepresentations, that citing the Beechcroft case, you can have a RICO claim that's dependent upon concealment or failures to disclose. I mean, did you separate these claims the way he asked you to? Yes, sir, I believe we did. Show me where you did it. Where we did it, after discussing the studies, we go through all of the press releases that they make where they never disclose the facts that they had from these studies. That's by definition what's happened in Beechcroft, which he discusses above the part that you quote and says a RICO claim can be based on the failure to disclose. And that's what we took to heart. They make all these representations. But you just said you didn't even allege a duty to disclose. And our case in Cal Architectural says that absent an independent duty such as a fiduciary duty or explicit statutory duty, failure to disclose cannot be the basis of a fraudulent scheme. So I didn't really see that you had fulfilled that obligation imposed by the district court. I believe, Your Honor, that especially after Twombly, what you have to do is to allege sufficient facts to make the duty to disclose plausible. And we allege those sufficient facts to make the duty to disclose plausible, as I believe we are now required to do under Twombly. And we did that throughout in making these numerous allegations about what they had done and didn't do. And also in amending, we deleted all of the RICO allegations related to the kidney dialysis question. We trimmed down the claims considerably, and we thought that was what he was asking us to do. I know I'm over my time. Here's what he said. Here, I'm going now in the June 17, 2009, minute order. And he says, as currently pled, talking about the amended complaint, however, plaintiffs have not stated any particularized facts, which, if true, establish that Amgen fraudulently misrepresented the effectiveness of EPO. The inclusion of conclusory adjectives, quote, false, unquote, deceptive, in quotes, without more is insufficient to cure the deficiencies of the previous pleading. And then he goes into detail after that. He worked hard to get all this stuff out for you, tell you what to do. But you didn't do it. Your Honor, if you read the complaint starting at paragraph 71, we worked hard, too, to investigate the studies that they had, that AERCEO admitted that he should have disclosed this information about AERNEFS in February of 2007. We worked hard to lay out all of those studies. And if you read starting in paragraph 71, we hit study after study with specificity about who did the study, what the study was, what the study showed, and then the press releases that they had over and over, where they never disclosed any of that information that they had from these studies that we allege with specificity. I think that's what... He told you you had to separate the claims that can only be made by the government from the others, like the RICO and the rest. Did you do that? Yes, sir. Those are claims that can be made under RICO. Did you have two separate sections in that complaint where you did that? I don't think, Your Honor, he asked us to put a section in what the government could say. They did violate the FDCA, but we read it as saying, make the allegation of how they acted with fraud, including fraudulent concealment, and we made those allegations. You were not thinking about what he wanted you to do, how he thought you ought to plead it. He gave you a lot of good information over here. You didn't do it. He added the words falsely and some other word over there. That doesn't cut the ice. Well, Your Honor, we also made the claims very specific. Before, the RICO claims were much broader. We made them far more specific here. Before the RICO claims, there was a kidney dialysis RICO claim. That came out. There were two other defendants that came out. We came down to address what Amgen knew and what they told and didn't told, which is what fraud is all about in a marketing scheme. And that's what we did, and that's what we understood he was directed to do. In fact, if you look again right above the part that you read, Judge Gutierrez talked about an allegation we had made about a dear doctor letter that could be fraudulent and that he recognized as fraudulent. That's still in there, but now that's not fraudulent, according to his ultimate ruling. That's still in there. There's a lot more in there. There is plenty of allegation of fraud to satisfy a 12B6 standard here, with all due respect. I tried to save some time. I'm way over. I don't know if I'm allowed to come back. Yeah, we'll let you go. Thank you very much. Good morning, Your Honors. My name is Mark Sheffro, and I represent Amgen. We respectfully submit that the Court should affirm the District Court's dismissal with prejudice of the amended consolidated complaint for two primary reasons. First, after painstaking analysis that Your Honors have talked about, the Court went through multiple efforts, multiple pleadings, and determined that the plaintiffs failed to meet the Rule 9B pleading requirements with respect to specificity. Indeed, plaintiffs have not identified a single statement by Amgen that's false, misleading, or contains a material omission. Second... Excuse me. And just, Chris, if you would answer the question, why doesn't false promotion of drug use for unsafe purposes constitute fraud? I think that's... I'll answer that, Your Honor. I think that's not what was alleged. What Judge Gutierrez, I think, appropriately determined, at best, and let me take a step back, there's been no finding by the FDA of off-label marketing here. So we're taking these allegations. The FDA, as this Court is well aware, is empowered to determine if there's been misbranding, if there's been off-label marketing. There's been assumption by plaintiffs that even these press releases that they admit are objectively honest, truthful, are off-label, but there's been no finding of that. What I think Judge Gutierrez did appropriately was say, if all you've done is allege a violation of the FDCA, because it's a strict liability type determination, in other words, let's take drug A. If a pharmaceutical company were to go in on Monday and say, we think you should use drug A for this particular purpose because it works, and on Tuesday the FDA approves drug A for that same purpose, that would be a violation of the Food, Drug, and Cosmetic Act, and that would be wrong, but it wouldn't be false or fraudulent or omissive. So what he basically says, all you've done, at best, is to allege that there had been some off-label marketing, but RICO and the UCL require far more. And I think the second reason why the Court should, does that answer your question, Your Honor? Yes, it does. Thank you. Plaintiffs fail for lack of causation in each of them. And that's true whether this Court analyzes the causation issue under Rule 8, or whether it analyzes it under Rule 9, or whether it turns to the Article III standing requirements or the standing requirements as articulated by the Supreme Court in Holmes, Anza, or more recently in Hemigroup. Now, I think Your Honor's questions were directly on point here. We've attached, as part of the record, a markup, a black line of the complaint, and I think it's fairly red. These are just semantic changes. The Court gave plenty of opportunity for these very sophisticated, both plaintiff's counsel and funds. These are large insurance companies, at best, to make these types of changes. This is information that's squarely within their control. In other words, they know the patients, they know the prescriptions, they know the doctors. I think what's particularly instructive, in addition to looking at the black line, notwithstanding that there's millions or billions of dollars of damages, the very first few paragraphs of their complaint, they allege that upon information and belief, upon information and belief, they may have paid for certain of these products for off-label uses. So even there, they haven't even established the Twombly or Iqbal rules with respect to the injury aspects. Plaintiffs have attempted to craft, essentially, a multi-party, multi-step chain, an attenuated chain of causation. It basically said, Amgen made certain statements, then USPDI relied, then CMS and Medicare, and ultimately the funds. And I'd like to talk about it, because I think Your Honor asked a question or two about the studies, just to be clear about what I understand the complaint says. First of all, these are two studies that are not Amgen studies. What's not alleged in the complaint is that Amgen had any information or had these studies prior to the USP's determination. There's no allegation as to what USP relied on, whether they otherwise had this information. The plaintiffs state, at page 40 of their brief, while the mailings and transmissions made by Amgen may not have been literally false, plaintiffs allege the conduct was deceptive and misleading thereafter. So they have not alleged that there's any deceptive or false statement in any mailing or statement by Amgen. Indeed, they have said they've never received, much less relied upon, a statement. So this goes to Your Honor's duty question. So really, at best, what we have here in the other study, there's no allegation that Amgen ever received it, much less before the USPDI made its determination. So there's a host of not just pleading deficiencies, but technical core issues with respect to both causation and with respect to their injuries. Your Honor, I'd like to take a few minutes and also then just turn, if I could, to the causation issue with the Court's indulgence. Now, this is not an issue that the Court addressed below, but I think as this Court determined, Your Honor determined, and issues that have been raised below, certainly the Court can address, particularly issues that go to causation. The Supreme Court has held that the touchstone of causation for a RICO claim is the presence of a direct injury, and that's in the Bridge decision. And earlier this year, in the Hemigroup decision, which was a plurality decision, the Supreme Court explained that there's no direct injury where there are multiple steps in the chain of causation and where causation depends on the actions of independent actors. The Court then said the Supreme Court held this theory did not plausibly allege causation, the same theory that's alleged here, because it rested on the independent actions of third or even fourth parties. So again, putting aside for a moment all of the very substantial pleading deficiencies with respect to Rule 9b and with respect to Rule 8, even if the plaintiffs had pled under Hemigroup, the causal chain that they've articulated or that they've tried to put together with these multi-step, multi-party independent actions would simply not satisfy the Supreme Court's causation analysis under Hemigroup. What we have here is alleged statements by Amgen, not to these third-party payer insurance companies, but to the market. Then we somehow have USP making determinations, no specificity about what it is that they relied on, how they made their decision-making process. Then we have CMS and Medicare, and a long-running case with District Court of New Jersey in analyzing how CMS and Medicare determine that they're not just a, if you will, a shill organization. In other words, this isn't a domino effect that if USP makes a decision, CMS and Medicare, they're independent actors that actually evaluate this information. And then what's absolutely noticeably absent from plaintiff's complaint is any mention of doctors. Now, these are prescription medicines, and no patient can lawfully receive or obtain a medicine without a prescription from his or her physician. So another step in the chain, and there's been a long string of virtually unbroken Federal Court cases which have focused on this attenuated causal chain, most of which focus on the independent judgment decision-making of physicians. What decision did the doctor receive? What did she hear? Why did she make a determination? What is the patient's profile? All of those are independent decisions that break the causal chain. And then in cases like this, we have pharmacy benefit managers, and then we ultimately have the third-party payers. In Hemigroup, the Court said three to four actors breaks the causal chain when they're independent. Here, we have far more. I'd just like to take a minute or two and speak to the UCL claims as well. To the extent that they sound in fraud, as the Court is well aware, the same deficiencies would apply with respect to Rule 9, including the specificity. I don't think the plaintiffs disagree with that. To the extent that they have sought to try and base their cause of action on the unlawful prong of the UCL by claiming that it's a violation of the FDCA, I think this Court's decision in the photometrics directly and squarely addresses that issue as well. So unless the Court has any additional questions. Let me just ask, would you clarify for me how a UCL claim differs from a RICO claim? They're both subject to Rule 9b. The UCLA seems to require a plaintiff to show that the public is likely to be deceived. Is this a lower standard than RICO because it doesn't require an outright false statement? Well, I think I would answer there are differences between RICO and the UCL, certainly in some regards, Your Honor, but I think with respect to the elements that we're talking about, the pleading with specificity of the Rule 9 certainly would apply, and the standing requirements under Article 3 would certainly apply here. And there's just too tenuous a chain when you analyze it under RICO, when you analyze it under the UCL. When you have these multi-party, multi-step, independent decision-makers, I think that there's no way the plaintiffs can conceptually, their framework, state a UCL claim much less a RICO claim. Thank you. Thank you, Your Honor. So you're really saying, in a sense, that there shouldn't be a class action. Is that what you're saying? Your Honor, I would say that if this case ever got to it, but I would say even as an individual claim, here there is no claim that the third-party payer plaintiff received a message, relied on it, acted to its detriment. We don't have that at all. There's not even an allegation that there's any fraudulent statement to anyone. And what they basically say is that these press releases, that dealing with, as Your Honor pointed out, dealing with absolutely different studies, no allegation that those press releases are in any way false or misleading, or that the underlying studies are false or misleading, but some allegation with an unnamed duty that in issuing a press release two or three or four years later, somehow a duty arose to mention a study by another company that terminated its enrollment period earlier. There's absolutely no nexus between those two. And there's no allegation here that the hub of their entire complaint is that somehow this misled the USP who puts out the USPDI. But, again, no allegation that the USP relied on any of this information. I mean, just from what we know, you know, the USP is an entity that searches the medical literature. From a plausibility perspective, the fact that they would have relied on a press release as opposed to the underlying studies and articles seems to be incongruous. But there's not even an allegation that they did. And then there's no allegation that the plaintiffs actually relied on any decision-making, the plaintiff's insurance company of the USP. So on virtually every level, there is a pleading deficiency with respect to the fraud claims. And then from a conceptual causation perspective, there's an absolute deficiency with respect to the causation analysis. Thank you, Your Honor. And please, the Court, on the causation question, in Judge Gutierrez's February 20, 2008 order, he found that we had adequately alleged both causation and injury. And he never reversed that. His other orders, he changed his position on some things, but he never changed that. The finding below was that we had adequately alleged. But how do you address the opposing counsel's point that there is no causal chain that's sufficiently direct under the Supreme Court's precedent? Well, Your Honor, here is how there is the causal chain. We do allege they submitted information, including one of the studies, the Smith study, to the USP group. We did allege that they relied upon it. We did allege that when USP found out about the information that Amgen had, and we say in the complaint they had it, in the paragraphs I discussed earlier in the 70s, we say Amgen had this information. When USP found that information out in February of 2007, after the scholarly literature started to disclose what Amgen had known since 2003, USP immediately delisted it. The very next month, the FDA issued its black box warning, and what did it say it relied upon? It said it relied upon the black box warning on Aroness, too, by the way. It said it relied upon the very information that Amgen had in 2003 from the studies we allege. Medicare, after a comment period, relied on the same information in delisting and refusing to cover the payment for EPOs for treatment of anemia of cancer. With respect to our sheet metal workers plan, that meant that they automatically, since it's a Medicare Plus plan, they automatically did not pay for it. The others allege that it came off their formulary, just what the Second Circuit in the Zyprexa decision said plans could do, as opposed to going through doctors. When it comes off USP, it comes off the formularies, and it's no longer covered and no longer paid for. So the causation here is clear, but the district court found causation. I mean, the finding below is we satisfied that. So that issue, at the very least, should not be part of this appeal. Your Honors, in terms of what we did, and with all due respect, we did allege that these press releases were misleading and false, because we discussed how Amgen did not include the very damaging information that they had from the studies that we allege that occurred in 2003, the information from 2004, and finally the study in December of 2006, when they're immediately issuing another press release set out, I think in paragraph 78, about how using Aaron S. for anemia treatment of cancer, a treatment of anemia of cancer, was a valid treatment. What we did, Your Honors, when we got the judge's order, we knew what he had said in the first order. He said you have sufficiently pled, and if you look at pages 10 and 11 of his first order, he said you've sufficiently alleged in the press releases the time, the specificity, you've satisfied the 9B requirements. All of that is referring to the, not to the kidney dialysis part that was in the complaint. He comes back and says you haven't alleged kidney dialysis. But it was referring to the other stuff, the off-label uses for like treatment of cancer and anemia of cancer. He has said to us you've satisfied 9B there with respect to those allegations. And it's in the paragraph, it's number B on pages 10 and 11 of his first order. He comes back in his second order, and we believe he's focused on the issues related to kidney dialysis. And we take heed to what he says, and we make substantial changes. We delete the RICO claim for the kidney dialysis. We delete the kidney dialysis RICO claim. We delete the kidney dialysis defendants. And we understood that to be the intertwining issue that he was concerned about. The other allegations that he had already found to be sufficient, we kept in the complaint. And we do allege that all of these press releases, when they didn't include, and they weren't years after, Your Honor, some of these they would get information on both in 2003 and in 2006. Amgen would get information in the same month and issue a press release that talks about a study that one of their people did, never disclosing that fact, that they had paid for. They never disclosed that fact. But even more importantly, they never disclosed the information from the studies they have saying that people with cancer who are not taking chemotherapy are going to die sooner if they take these drugs. And with that information not disclosed, we thought that was highly misleading. We still think it's highly misleading. Judge Gutierrez, in his first order, found it to be misleading and adequately pled under Rule 9b. And we thought that was still correct. Now, if we misunderstood, we apologize to him and we apologize to you. It was not our intent to make him or you or anybody else do extra work. But having had an order out there that already said you satisfied 9b with respect to these allegations, we believed that to be true. And we relied on it. And we proceeded on that basis. And if we were wrong, we were wrong. But it should not prevent our client from being able to go forward with their day in court to recover from these hundreds of millions of dollars that they cost, we will be able to show causation in this instance because this is not at all like the Zyprexa cases where you have to go through doctors. Once you're delisted from the formulary, once you're off USP, putting aside the Sheet Metal Workers Fund, which automatically wouldn't pay for these because of what Medicare did. But once you're delisted, you're off the Medicare, and you're off the formulary, and therefore we don't pay for them, period. And these are union health and welfare funds. We don't pay out those claims because they're not appropriate to be paid out. And it doesn't matter. We do allege fraud on doctors over and over. Apparently both sides are reading a different complaint. But if you look through, we do allege there's fraud on doctors. But that doesn't matter once it's not covered. It's not covered. It doesn't matter how many prescriptions the doctor writes. We still don't pay for it because it's not covered. Let me ask you this. Did you ever move for the district court for reconsideration? No, Your Honor. When the district court said we were dismissed with prejudice, we thought the remedy was to appeal, and we didn't file a motion for reconsideration at that point. I don't think we were required to. No, no, you're not required to. We did not move for reconsideration, Your Honor. And you may think this is a crazy question, and I don't know if this case is even capable of this kind of an approach, but did you ever diagram this case? We did not. Obviously, I never say a question that you ask was crazy, but that was not a crazy question. We did not diagram it. A lot of people don't believe in it. I think it would have been helpful, but we did not. I mean, not just for the court, but for yourselves. We have outlines. We have done for ourselves outlines. They're not diagrams per se, but we've done similar things to try to get the... Well, you know, you start out, and this is what you're doing. Were you trying to get from here to there? Yes, sir. And did you do research and diagram how you were going to get there? We did research, Your Honor, and I think that the complaint, the last amended complaint especially, does set out in very great detail the studies that they did, how those studies were never disclosed, even when they were very close in time to when they issued press releases. And then the press releases they issued based on the studies that they financed, without disclosing that fact, and how they didn't disclose the other very damaging information they had. We did set that out, and I think we set it out in a logical and succinct way, with respect to the off-label purposes for both anemia of cancer and cancer treatment, and also it was less in sales, but the heart issues where they had off-label purposes, another issue that the FDA issued the black box warning on, ultimately, when the facts came to light in February of 2007. But we didn't submit to the court below a diagram setting that out. I agree it would have been helpful, and I agree in retrospect it would be helpful, and if you let us go back, we certainly will. I'm just asking these questions, that's all. Because, you know, I tried to tell you before, these are, they get more complicated. I mean, I've handled some multi-district cases in the past, but they take up a lot of time, a lot of work, and, you know, today, here in the Central District, when I left there, oh, I think probably the average caseload was maybe 150, 175, 200, somewhere in there. Now it's way above, probably 500 or 600. It's huge. Did you know that? Yes, sir, Your Honor. It's huge. So it, I think it behooves a lawyer who's smart to get things in good shape and organized and clear, so it's just laid out, easy reading, you know, take it from one step to the other, break it down, outline it, and that's all I'm saying. And it's something that you have to keep in mind, you should keep in mind, because just administering this kind of case and the heavy loads, and the heavy loads that we face, too, is not easy. Sometimes one day here is about, if you could weigh it somehow, is equivalent to two months' work 20, 30 years ago. Well, Your Honor, what you say is absolutely correct. I think if you look at our track record, I think we've had pretty good success at doing exactly what you say. In the central district when Judge Fischer had the Mattel case, after she denied the motion to dismiss, we were able to resolve it in a way that it got consumers back an awful lot of relief, including people that had already benefited from the recall, even more relief. When we litigated with Judge Acuda's former firm in managed care litigation, I think we've had very similar successes. Once original rounds of motions are over and done, we've had great success, I think, in achieving significant settlements that, while there's still burdens on the courts, they take an enormous amount of the burdens off. And I think we've got a pretty good track record of doing that. If we failed in getting what we should have done here, it certainly wasn't my intent, and we were certainly believing we were addressing the kidney dialysis problem, where, frankly, we didn't have the same kind of misrepresentations to the great extent that we have here. We didn't have the studies that we have here on this side. And that's why we amended the complaint as we did and thought we were doing what the judge wanted us to do. Okay. Thank you very much. Thank you very much. It's good to have you here, both of you. And Judge, they're lawyers. What? On the matters you raised in the last one, there are a number of us trying to address the issue of judges getting through Congress. We were there two weeks ago. No, that's all right. We don't. We don't. That's the least of my worries. Well, it's a worry for all of us. Well, it's the way things work today. But we've had other periods in our history where that's happened as well. We'll get through it. Yes, sir. Thank you very much. Okay. Thank you. All rise. This court has a second time adjourned.
judges: Pregerson, Nelson D. W., Ikuta